UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION,<br><br>Defendant. | Civil Action No. |

## NOTICE OF REMOVAL

Defendant Exxon Mobil Corporation ("ExxonMobil"), hereby removes this action, currently pending in the Suffolk County Superior Court of the Commonwealth of Massachusetts, to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. §§ 1331, 1332(d), 1441(a), 1442, and 1453(b).[1] To the extent any part of Plaintiff's causes of action can be construed as non-federal, this Court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as those causes of action over which the Court has original jurisdiction.

While purportedly brought under state law and in the name of consumer protection, this lawsuit by Plaintiff the Commonwealth of Massachusetts, acting through its Attorney General ("Plaintiff" or "MAAG"), is the culmination of a multi-year plan concocted by plaintiffs' attorneys, climate activists, and special interests to force a political and regulatory agenda that has

---

[1] By filing this Notice of Removal, ExxonMobil does not waive any right, defense, affirmative defense, or objection, including based on a lack of personal jurisdiction. *See, e.g.*, *Carter v. Bldg. Material & Constr. Teamsters' Union Local 216*, 928 F. Supp. 997, 1000-01 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction." (citing *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929))).

not otherwise materialized through the legislative process.  From the day MAAG announced the underlying investigation to its recent rush to file this lawsuit in the midst of the trial of a similar suit brought by the New York Attorney General,[2] it has been abundantly clear that MAAG has been engaged in a pretextual use of its law enforcement power to further a political agenda, bar ExxonMobil from participating in the public discourse about climate change, and force a societal change toward what MAAG deems a "clean energy future."

When viewing the Complaint's allegations in this context, it becomes even clearer that this suit is neither about consumer protection, nor properly brought under state law.  It instead seeks to wade into complex federal statutory, regulatory, and constitutional issues and frameworks, and to substitute one state's judgment for that of longstanding decisions by the federal government about national and international energy policy and environmental protection.  A suit of this nature should be heard, and promptly dismissed, by a federal court.

## TIMELINESS OF REMOVAL

1.      Plaintiff filed this action against ExxonMobil on October 24, 2019, in the Suffolk County Superior Court as Civil Action No. 19-3333.  ExxonMobil was served on October 30, 2019.  This Notice of Removal is timely because it is filed within 30 days of service.  *See* 28 U.S.C. § 1446(b).

---

[2] In *People of the State of New York v. Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct.), the New York Attorney General filed a four-count complaint alleging a longstanding fraudulent scheme to defraud investors about how the Company addressed the risks of climate change.  A bench trial proceeded before the Honorable Barry Ostrager on October 22, 2019, and concluded on November 7, 2019.  In its summation, however, the New York Attorney General asked the court to dismiss its fraud counts (two of the four counts in the complaint), effectively conceding it had failed to introduce any evidence of intent or reliance—core elements of fraud.  Ex. 1 at 2072:7-2073:10.  The case is currently under submission with a decision expected on the two remaining claims before the end of the year.

## FACTUAL BACKGROUND AND SUMMARY OF ALLEGATIONS

2.       On March 29, 2016, MAAG and a coalition of state attorneys general, calling themselves the "Green 20," held a press conference entitled "AGs United for Clean Power," hereinafter referred to as the "Green 20 press conference."  Lamenting the perceived "gridlock in Washington," the Green 20 announced "collective efforts to deal with the problem of climate change" and vowed to "step into this [legislative] breach" through "creative[]" and "aggressive[]" use of the powers of their respective offices to end the world's reliance on fossil fuels.  Ex. 2 at 1-3, 5.

3.       Attorney General Healey's specific remarks echoed this agenda, proclaiming "there's nothing we need to worry about more than climate change," and pledging to undertake "quick, aggressive action" to alleviate the threat to "the very existence of our planet" by moving the country toward a "clean energy future."[3]  *Id.* at 12-13.  Her comments also made clear that her "investigation" had a preordained conclusion—that ExxonMobil had engaged in deception.  *Id.* (describing the "troubling disconnect between what Exxon knew" and what it "chose to share with investors and with the American public").[4]

4.       The Green 20 press conference was the product of closed-door meetings with climate activists and plaintiffs' lawyers.  Since at least 2012, when they gathered in La Jolla, California, to participate in a "Workshop on Climate Accountability, Public Opinion, and Legal

---

[3]  *See*  https://www.algore.com/news/former-vice-president-al-gore-and-a-coalition-of-attorneys-general-from-across-the-country-announce-historic-state-based-effort-to-combat-climate-change (link to video of Green 20 press conference; Attorney General Healey's comments begin at 33:11).

[4] The overtly political nature of the Green 20 press conference drew a swift and sharp rebuke from thirteen other state attorneys general, who criticized the Green 20's efforts to "[u]s[e] law enforcement authority to resolve a public policy debate."  Ex. 3 at 3.

Strategies," these activists sought to influence the debate surrounding climate change by gaining access to ExxonMobil's internal documents. Ex. 4. La Jolla workshop attendees reached nearly unanimous agreement on the importance of using legal actions to "maintain[ ] pressure on . . . industry that could eventually lead to its support for legislative and regulatory responses to global warming" and further recognized that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light." *Id.* at 11-12, 27.

5.     Two climate activists who led the effort to access ExxonMobil's records gave secret presentations to the attorneys general before the Green 20 press conference commenced.[5]  At the beginning of 2016, one of these activists and groups representing special, private interests met at the Rockefeller Family Fund offices to discuss the goals of a so-called "Exxon campaign." Ex. 5. These goals included:

- "To establish in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm."

- "To delegitimize [ExxonMobil] as a political actor."

- "To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc."

- "To drive divestment from Exxon."

- "To drive Exxon & climate into [the] center of [the] 2016 election cycle." *Id.*[6]

---

[5] These presentations were not only closed to the public, but the AGs also directed the participants to conceal their participation. *See* Ex. 7 ("My ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event.").

[6] ExxonMobil's allegations concerning the La Jolla workshop, "Exxon campaign," and MAAG's coordination with private interests were addressed in proceedings against attorney Matthew Pawa and California municipal officials arising from their efforts to suppress ExxonMobil's speech about climate policy. *Exxon Mobil Corp.*, No. 096-297222-18, 2018 Tex. Dist. LEXIS 1 (Tarrant Cty. Tex. Apr. 24, 2018), *appeal filed*, No. 02-18-00106-CV (Tex. App.—Fort Worth, Apr. 2, 2018). Judge R. H. Wallace of the District Court of Tarrant County, Texas, found ExxonMobil's evidence sufficient to support exercising personal jurisdiction in the matter. *Id.* at *14.

6.     On April 19, 2016, three weeks after the activist-driven Green 20 press conference, MAAG issued a civil investigative demand ("CID") to ExxonMobil. Ex. 6. In response, ExxonMobil moved to quash the CID in Massachusetts state court[7] and filed a separate, federal action in the Northern District of Texas against Attorney General Healey, seeking injunctive and declaratory relief for violation of its rights under the First, Fourth, and Fourteenth Amendments, the Commerce Clause, and Texas common law.[8] MAAG then requested a tolling agreement from ExxonMobil, agreeing not to seek any documents or depose any witnesses pursuant to the CID pending the final resolution of the two aforementioned actions (one of which is still pending). ExxonMobil agreed with MAAG's request, and the parties signed a tolling agreement in June 2016. Ex. 8. After months of no substantive discussions between the parties, MAAG provided notice of this lawsuit in October 2019, on the eve of ExxonMobil's multi-week trial against the New York Attorney General in New York state court. *See* Ex. 9-10.

---

[7] The summary proceedings that followed the motion to quash were limited to evaluating the CID's validity under the authorizing statute, Mass. Gen. Laws Chapter 93A, § 6, and personal jurisdiction. The Massachusetts Superior Court denied ExxonMobil's motion and granted MAAG's cross-motion based on Massachusetts state law, but expressly did "not address Exxon's arguments regarding free speech." *In re Civil Investigative Demand No. 2016-EPD-36*, 2017 WL 627305, at *4 n.2 (Mass. Super. Jan. 11, 2017). The Massachusetts Supreme Judicial Court affirmed, but acknowledged that ExxonMobil's federal action "challeng[es] the C.I.D. on constitutional grounds not raised in th[e] [state] action." *Exxon Mobil Corp. v. Attorney General*, 479 Mass. 312, 328-29 (2018).

[8] In that federal action, Judge Kinkeade concluded that ExxonMobil's allegations were sufficiently plausible to warrant jurisdictional discovery because "Attorney General Healey's actions leading up to the issuance of the CID causes the Court concern and presents the Court with the question of whether Attorney General Healey issued the CID with bias or prejudgment about what the investigation of Exxon would discover." *Exxon Mobil Corp.* v. *Healey*, 215 F. Supp. 3d 520, 523, 532 (N.D. Tex. 2016). Before discovery, however, Judge Kinkeade transferred the case to the Southern District of New York. Judge Caproni's decision dismissing ExxonMobil's complaint is currently on appeal to the Second Circuit. *Exxon Mobil Corp.* v. *Schneiderman*, 316 F. Supp. 3d 679, 687 (S.D.N.Y. 2018), *appeal docketed*, No. 18-1170 (2d Cir. Apr. 23, 2018).

7.     MAAG had no legitimate reason to file suit at that time.  MAAG's rush to the courthouse was clearly the result of a deliberate strategy to interfere with ExxonMobil's trial preparation, assist a fellow Green 20 member in achieving the goals of the "Exxon campaign," and capitalize on the inevitable media coverage surrounding the New York trial.  The timing of MAAG's filing also deprived ExxonMobil of its statutory right to meaningfully meet and confer under Chapter 93A, § 4—ExxonMobil had to either sacrifice trial preparation to meet with MAAG, or forfeit its opportunity to resolve or narrow the issues raised by this suit.

8.     When MAAG filed its four-count complaint in this action on October 24, 2019, its allegations echoed both MAAG's predetermined conclusions announced at the 2016 Green 20 press conference and the goals of the climate activist-led La Jolla workshop and "Exxon campaign."  In this light, it is clear that although nominally premised on state law and cloaked as consumer protection, this lawsuit at its core seeks to restrict the production, sale, and use of fossil fuels, attempting to usurp policy and foreign affairs roles properly reserved to the federal government.  *See, e.g.*, Compl. ¶ 35 ("[P]roduction and consumer use of such transportation fuels is a leading cause of climate change that endangers public health and consumer welfare."); ¶ 39 (citing a need for "an orderly transition away from fossil fuels" and alleging that "continued investment in ExxonMobil's fossil fuel business and production and use of ExxonMobil's fossil fuel products would bring about cataclysmic outcomes for humankind"); ¶ 598 (alleging that "ExxonMobil . . . impeded and deferred the essential transition to cleaner energy sources").

9.     Litigation about the appropriate use of fossil fuels and the global issues presented by climate change belongs in a federal forum because it necessarily raises disputed and substantial federal questions, is governed by federal common law, and implicates actions ExxonMobil took under federal leases.  This lawsuit is also in essence a putative class action under Massachusetts

law, and meets the requirements and overall purpose of the Class Action Fairness Act ("CAFA"), which favors federal jurisdiction over cases with significant interstate ramifications.  For these reasons and as explained in more detail below, this litigation must be heard in federal court to address the important national and international policies implicated.[9]

## GROUNDS FOR REMOVAL

### This Action Raises Disputed and Substantial Federal Issues

10.    Suits that purport to allege only state-law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).

11.    Plaintiff's lawsuit attempts to undermine and supplant federal and foreign policy and hold a single fossil fuel manufacturer responsible for the alleged impacts of global climate change.  Plaintiff expressly brings this suit, in part, based on MAAG's "authority to prevent or remedy damage to the environment" caused by corporations.  Compl. ¶ 45 (citing G.L. c. 12, § 11 D).

12.    Plaintiff's "greenwashing" allegations, which pertain to certain of ExxonMobil's fuel and motor oil products, are particularly demonstrative of this suit's ultimate aim.  *See, e.g.*, Compl. § VI.B.  Plaintiff alleges that "even if it is technically true" that these products "improve internal combustion engine performance and/or efficiency," they could never be considered "safe and environmentally beneficial" because "the development, production, refining, and consumer

---

[9] If Plaintiff challenges this Court's jurisdiction, ExxonMobil reserves the right to further elaborate on these grounds beyond their specific articulations in this Notice.

use of ExxonMobil fossil fuel products" increase "greenhouse gas emissions." *See id.* ¶ 601 (such advertising claims are "highly deceptive"), ¶ 602, ¶ 645. This is not a consumer protection argument; it is a statement of policy directly in conflict with Congressional and Executive branch decisions. The issue here is not the representations made in advertisements in Massachusetts, but the fact that the products are sold *at all*. The practical result of MAAG's claim—that fossil fuel products cannot be considered "safe" under Massachusetts law—amounts to a demand that ExxonMobil cease its sales altogether. *See id.* ¶ 600 (the "production and use of ExxonMobil's fossil fuel products emit large volumes of the dangerous greenhouse gas pollution that is causing disruptive climate change impacts").

13.     Using the ill-suited tool of the Massachusetts consumer protection statute, MAAG seeks to substitute its preferred energy policy for the federal government's, as manifested in climate change treaties. For decades, the United States' international climate change policy has sought to balance environmental policy with economic development. *See* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (announcing the United States' withdrawal from the Paris Climate Accord based on, among other things, financial burdens and energy restrictions). Plaintiff's lawsuit improperly asks a court to weigh in on precisely those issues. *See, e.g.*, Compl. ¶ 310 (noting "the current federal administration's stated intent to withdraw from the" Paris Agreement). *Cf. Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (claims that implicate the "exercise of state power that touches on foreign relations" in a significant way "must yield to the National Government's policy"); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381, 388 (2000) (striking down Massachusetts law barring state entities from transacting with companies doing business in

Myanmar because the law "undermine[d] the President's capacity . . . for effective diplomacy"); *City of Oakland v. BP P.L.C.*, 325 F. Supp. 3d 1017, 1026 (N.D. Cal. 2018) (Alsup, J.) ("Because this relief would effectively allow plaintiffs to govern conduct and control energy policy on foreign soil, we must exercise great caution.").

14.     There is thus no question that Plaintiff's pretextual litigation—although nominally derived from Massachusetts' consumer protection statute—raises several "actually disputed and substantial" federal issues for which federal jurisdiction would not disrupt "any congressionally approved balance of federal and state judicial responsibilities." *See Grable*, 545 U.S. at 314.  *Cf. In re Pharm. Indus. Average Wholesale Price Litig.*, 457 F. Supp. 2d 77, 79, 82 (D. Mass. 2006) (denying motion to remand consumer fraud case that turned on a Medicare statute definition).  If anything, allowing these causes of action to proceed in state court would disrupt federal interests.

15.     Specifically, Plaintiff's suit is an attempt to supplant delicate international negotiations and Congressional and Executive branch decisions intended to address both environmental policy and economic growth.  To illustrate, Plaintiff's theory of wrongdoing assumes that "the world must swiftly shift away from fossil fuel energy" and that ExxonMobil has "perpetuat[ed] reliance on fossil fuels around the world." *See, e.g.*, Compl. ¶ 767.  Plaintiff's causes of action would also require a court to determine whether "substantially curtailing the use of fossil fuels is necessary to stabilize the increase in global average temperature and reduce the risk of catastrophic climate change." *Id.* ¶ 811.  One of the regulations underlying Plaintiff's third and fourth causes of action would force a court to evaluate the "safety," "utility," and "benefit to be derived from the use" of fossil fuels. *See id.* ¶ 774 (citing 940 C.M.R. § 3.05(1)).

16.     But Congress has already sought to strike the appropriate balance between energy production and environmental protection by enacting federal statutes, *see, e.g.*, Clean Air Act, 42

U.S.C. § 7401(c),[10] and directing federal agencies to regulate ExxonMobil's conduct and perform their own cost-benefit analyses. *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants, 80 Fed. Reg. at 64683–84 (EPA considering impacts of "wildfire" and "extreme precipitation events"). The federal government has thus weighed the costs and benefits of fossil fuels, and permitted their sale because, among other things, affordable energy is critical for economic growth. *See City of Oakland*, 325 F. Supp. 3d at 1023 ("[O]ur industrial revolution and the development of our modern world has literally been fueled by oil and coal. Without those fuels, virtually all of our monumental progress would have been impossible.").

17.   Plaintiff's request that a state court substitute its judgment for that of Congress and EPA on these issues—and impose significant penalties and injunctive relief based on Plaintiff's assertion that a different balance should be struck—constitutes a "collateral attack" on an entire [federal] regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection."[11] *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) (internal quotations omitted). Removal is appropriate under such circumstances.[12] *See, e.g., Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007)

---

[10] *See also* Energy Reorganization Act of 1974, 42 U.S.C. § 5801; Mining and Minerals Policy Act, 30 U.S.C. § 21a; Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201.

[11] These are difficult questions without easy answers—and MAAG should not be the arbiter of climate policy, particularly when it has failed in other instances to support implementation of "ambitious greenhouse gas reductions." *Kain v. Dep't of Envt'l Protection*, 474 Mass. 278, 282 (2016) (defending Massachusetts Department of Environmental Protection in suit regarding its refusal to promulgate regulations to establish GHG emissions limits).

[12] Plaintiff's suit also implicitly attacks the federal government's decision to contract with ExxonMobil to extract, develop, and sell fossil fuel resources on federal lands. *See infra* at ¶¶ 25-28. Any such collateral attacks also necessitate dismissal of this suit. *See, e.g., Tenn. Gas Pipeline*, 850 F.3d at 724.

(removal proper where claims were "a collateral attack" on the validity of agency action under a complex regulatory scheme); *Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 430 (4th Cir. 2004) (removal proper when consumer protection suit "effectively challenge[d]" the filed rate set by FCC); *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004) (same).

18.     Beyond the jurisdictional points raised above, it is also notable that Plaintiff's lawsuit puts at issue multiple important federal issues including, but not limited to:  (1) whether the First Amendment would allow ExxonMobil to be held liable for engaging in advertising and public relations campaigns that reflect a particular policy position with respect to fossil fuel use and climate change; and (2) whether a state court can burden the production, sale, and use of what federal policy has deemed an essential resource, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, and other constitutional principles.

19.     Finally, federal jurisdiction would uphold, not upset, the principles of federalism reflected in this case—federal courts are the traditional forums for litigation regarding the intersection of national resources, environmental law, and foreign policy.[13]  *See Grable*, 545 U.S. at 313 (federal jurisdiction must be "consistent with congressional judgment about the sound division of labor between state and federal courts").  As Judge Alsup in the Northern District of California held last year, the "international reach of the alleged wrong" of climate change requires "the scope of plaintiffs' claims to be decided under federal law."  *City of Oakland*, 325 F. Supp.

---

[13]  Nor would this Court's evaluation of Chapter 93A, § 2(a) raise issues unique under Massachusetts law, as this subsection must be interpreted consistently with Section 5 of the Federal Trade Commission Act.  *See* G.L. c. 93A, § 2(b) ("It is the intent of the legislature that in construing paragraph (a) of this section . . . . courts will be guided by the interpretations given by the [FTC] and the Federal Courts to section 5(a)(1) of the [FTCA].");  *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 766 (1980) ("The Massachusetts statute thus incorporates the extensive body of Federal administrative and decisional law under the FTC Act . . . at least in so far as it relates to definitions of 'unfair' and 'deceptive.'").

3d at 1028-29.

## Plaintiff's Complaint Arises Under Federal Common Law

20.     This Court also has federal jurisdiction under 28 U.S.C. § 1331 over Plaintiff's suit because its causes of action arise from federal common law.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (recognizing federal original jurisdiction over "claims founded upon federal common law").  Federal common law governs in limited areas that implicate "uniquely federal interests" such that application of state law would be inappropriate.  *See*, *e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-07 (1988); *Resolution Trust Corp. v. Gladstone*, 895 F. Supp. 356, 362–63 (D. Mass. 1995) (applying federal common law because there was "a significant interest in having a uniform standard of liability govern the conduct of directors and officers of federally chartered, federal insured, savings and loan institutions").

21.     One such area is "the general subject of environmental law and specifically . . . ambient or interstate air and water pollution."  *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421-22 (2011) ("*AEP*").  Claims rooted in the effects of global greenhouse gas emissions therefore implicate uniquely federal interests in environmental, energy, and national security policy and necessitate a uniform approach under federal common law.  *See, e.g.*, *id.*; *see also Massachusetts v. U.S. Veterans Admin.*, 541 F.2d 119, 123 (1st Cir. 1976) (federal common law "was originally recognized to fill a void in the law applicable to suits seeking abatement of pollution originating within the domain of one state sovereign and exerting adverse effects in the domain of another").  When evaluating recent global warming-related claims against ExxonMobil, both Judge Alsup and Judge Keenan in the Southern District of New York determined that such claims "are governed by federal common law."  *See City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y.

2018) ("[T]he City's claims are ultimately based on the 'transboundary' emission of greenhouse gases, indicating that these claims arise under federal common law and require a uniform standard of decision."); *California v. BP P.L.C.*, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018) (Alsup, J.) (claims "which address the national and international geophysical phenomenon of global warming—are necessarily governed by federal common law").

22.     As discussed above, although Plaintiff frames its suit as derived from a state statute that concerns consumer and investor deception, Plaintiff's course of conduct and key allegations demonstrate that this action is intended to hold ExxonMobil singularly liable for producing products that contribute to climate change.[14]   Because Plaintiff's suit is inherently premised on interstate pollution that causes environmental harm in the form of global warming, it implicates uniquely federal interests and should be governed by federal common law.[15]   *See BP*, 2018 WL 1064293, at *3 (a "patchwork of fifty different answers to the same fundamental global issue would

---

[14] Plaintiff's efforts to artfully plead its Complaint are unsurprising, given the impropriety of lawsuits seeking liability under a nuisance theory for the impacts of the lawful production, promotion, refining, marketing, and sales of fossil fuels. *See, e.g.*, *City of Oakland*, 325 F. Supp. 3d at 1029 (dismissing global warming nuisance claims because "the problem at hand clearly deserves a solution best addressed by [the political] branches"); *City of New York*, 325 F. Supp. 3d at 476 (dismissing similar claims with prejudice).

[15] That Plaintiff's suit includes allegations regarding ExxonMobil's global promotion, public disclosures, and investments relevant to climate change does not alter the conclusion that federal common law provides the exclusive mechanism for resolving at least some of Plaintiff's causes of action.  *Cf. BP*, 2018 WL 1064293 at *1 (holding suits governed by federal common law even though they were "premised on the theory that—despite long-knowing that their products posed severe risks to the global climate—defendants produced fossil fuels while simultaneously engaging in large scale advertising and public relations campaigns to discredit scientific research on global warming, to downplay the risks of global warming, and to portray fossil fuels as environmentally responsible and essential to human well-being").  Although "fixated on an earlier moment in the train of industry," Plaintiff's causes of action regarding the promotion and sale of fossil fuels still implicate the type of transboundary pollution suit that has historically been governed by federal common law. *See id.* at *4.

be unworkable"); *Kivalina*, 696 F.3d at 855–56; *AEP*, 564 U.S. at 422 (in cases like this, "borrowing the law of a particular State would be inappropriate").

**This Action Meets the Elements of the Federal Officer Removal Statute ("FORS")**

23.     This action can be removed under FORS because federal officers directed ExxonMobil to engage in activities that constitute the crux of Plaintiff's Complaint—i.e., the extraction and production of fossil fuels.

24.     FORS allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Removal under this statute is appropriate when "(1) [a] defendant can demonstrate it was acting under the direction of a federal officer or agency; (2) the defendant has a colorable defense under federal law; and (3) a causal connection exists between the defendant's acts or omissions and the claims asserted by the plaintiff." *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008). These elements are met here.[16]

25.     First, there is a causal nexus between ExxonMobil's alleged improper conduct, undertaken in part at the direction of federal officials, and Plaintiff's causes of action. For many years, ExxonMobil has explored for, developed, and produced oil and gas on federal lands pursuant to leases issued by the federal government. *See, e.g.*, Ex. 11. These leases require ExxonMobil to perform activities that, "in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson v. Philip Morris Cos.,* 551 U.S. 142, 154 (2007).

---

[16] ExxonMobil, a private corporation, *see* Compl. ¶¶ 46-47, is a "person" within the meaning of the statute. *See O'Connell*, 544 F. Supp. 2d at 58 (removal by private corporation "satisfied all three elements of the statute").

26.     As explained above, Plaintiff's causes of action are aimed at stopping or reducing ExxonMobil's production and sale of fossil fuels.  But that activity was precisely what federal leases required ExxonMobil to do.  These federal leases contain many provisions that demonstrate ExxonMobil acted at the direction of a federal officer when it undertook actions that, assuming the truth of Plaintiff's allegations, "are a major cause of global climate change," and will have "serious, life-threatening, and costly impacts on the people of the Commonwealth."  *See* Compl. ¶¶ 54-69, 222–52.  For example, these leases require ExxonMobil to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."  Ex. 12 § 10; *see also* Ex. 11 § 10 (instructing that "[a]fter due notice in writing, the Lessee *shall* drill such wells and produce at such rates as the Lessor may require") (emphasis added).  Drilling on these leased lands takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities.  Ex. 12 §§ 9, 10.

27.     Federal government control of leased oil and gas continues even after it is removed from the ground—the government has a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe," Ex. 12 § 15(d), Ex. 11 § 15(d), and mandates that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or independent refiners," Ex. 12 § 15(c); Ex. 11 § 15(c).

28.     When complying with such restrictions, obligations, and directives, ExxonMobil is likewise following the direction of the federal government.  *Cf. Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (removal proper when the defendants

"were acting under express orders, control and directions of federal officers") (internal quotations omitted).

29.     Moreover, ExxonMobil has several meritorious federal defenses to Plaintiff's lawsuit, including preemption, *see id.* at 487, and that Plaintiff's causes of action are barred by the Commerce Clause, Due Process Clause, First Amendment, and foreign affairs doctrine.  Each of these colorable federal defenses is sufficient to satisfy Section 1442.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, FORS allows removal of this action.

### This Action Satisfies the Class Action Fairness Act's ("CAFA") Requirements

30.     Plaintiff's lawsuit is also removable under CAFA, *see* 28 U.S.C. §§ 1332(d) and 1453(b), because Plaintiff is pursuing the equivalent of a class action and CAFA's statutory requirements are satisfied.  *See* 28 U.S.C. § 1332(d) (CAFA jurisdiction measured upon removal).

31.     CAFA allows removal of any "class action" where minimal diversity exists, at least 100 class members are represented, and "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs."  28 U.S.C. § 1332(d)(1), (2), (5); *see also* 28 U.S.C. § 1453(b).  The statute defines "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  *Id.* § 1332(d)(1)(B). According to CAFA's legislative history, "the definition of 'class action' is to be interpreted liberally.  Its application should not be confined solely to lawsuits that are labelled 'class actions' . . . .  Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions."  S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34.

32.     Although not labeled as such, this lawsuit is "in substance a class action," properly removable under CAFA.  *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013) (holding removal was proper irrespective of the plaintiff's "artificial attempt to disguise the true nature of the suit"); *see also Addison Automatics, Inc. v. Netherlands Ins. Co.*, 2015 WL 461958, at *3 (D. Mass. Feb. 4, 2015) (noting that factually similar *Hartford* case should have put the defendants on notice of removability even though the plaintiff "did not specifically mention Rule 23 or file the complaint as a class action").

33.     Massachusetts courts recognize that "[a]n action brought by the Attorney General under [Chapter 93A] § 4, is comparable to a class action." *Commonwealth v. Chatham Dev. Co.*, 49 Mass. App. Ct. 525, 528-29 (2000) (citing MAAG's "power to bring suit not only on behalf of those persons specifically injured but also on behalf of those similarly situated"); *Commonwealth v. DeCotis*, 366 Mass. 234, 245 (1974) ("The very purpose of the Attorney General's involvement is to provide an efficient, inexpensive, prompt and broad solution to the alleged wrong" similar to the available relief in a consumer class action).  Moreover, Plaintiff seeks to address purported wrongs in its representative capacity on behalf of Massachusetts consumers and investors and "in the public interest." *See, e.g.*, Compl. ¶¶ 51, 791, 804, 818, 828; *see also id.* ¶¶ 1-2 (seeking to "hold ExxonMobil accountable for misleading the state's investors and consumers"); *id.* § VII.A. (seeking determination that ExxonMobil has "commit[ed] deceptive practices against Massachusetts investors and consumers").

34.     CAFA's purpose is best served by litigating this case in federal court, as the statute was intended "to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications."  S. Rep. No. 109-14, at 35; *see also Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("CAFA's primary objective is to ensur[e] Federal court

consideration of interstate cases of national importance.") (citation omitted); *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013) (same).  As described more fully above, Plaintiff's lawsuit implicates issues of national and international importance—it belongs in federal court.

35.     Minimal diversity is present here.  *See* 28 U.S.C. § 1332(d)(2)(A) (requiring that "any member of a class of plaintiffs" be "a citizen of a State different from any defendant").  On information and belief, Plaintiff seeks to represent and seeks relief on behalf of citizens of Massachusetts.  *See e.g.*, Compl. ¶¶ 1-2.  ExxonMobil is not a citizen of Massachusetts.  *See* 28 U.S.C. § 1332(c)(1) (citizenship derived from states of incorporation and principal place of business); *see also* Compl. ¶ 46.

36.     The number of represented plaintiffs necessary for CAFA jurisdiction is present here because Plaintiff seeks relief on behalf of, among others, "Massachusetts-based institutional investors and investment managers," Compl. ¶ 269, and "Massachusetts consumers" to whom ExxonMobil has sold and marketed its fossil fuel products, *see id.* ¶ 600.  On information and belief, this number exceeds 100 purported class members.

37.     Although the Complaint does not allege a specific amount in controversy, Plaintiff's allegations demonstrate that CAFA's $5,000,000 threshold is satisfied.  *See* 28 U.S.C. § 1332(d)(2).  In noticing removal, a defendant need only include a "plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 574 U.S. at 89.  Here, Plaintiff alleges that ExxonMobil is liable under Chapter 93A for a sweeping pattern of deception in countless communications with investors and consumers over the last decade, and that Plaintiff is entitled to up to $5,000 for each purportedly misleading statement.  *See, e.g.*, Compl. ¶¶ 1, 2, 17, 29, 34, 36, 642, 647, 687, VIII. Request for Relief.  Although those allegations alone establish that the amount in controversy plausibly exceeds $5,000,000, Plaintiff also seeks "comprehensive

18

injunctive relief," which could independently satisfy the jurisdictional threshold.  *See Richard C. Young & Co. v. Leventhal*, 389 F.3d 1, 3 (1st Cir. 2004) ("Courts have repeatedly held that the value of the matter in controversy is measured . . . by the judgment's pecuniary consequences to those involved in the litigation.").  Additionally, Plaintiff requests compensation for the costs of its investigation and attorney's fees under Chapter 93A.  *See Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67, 81 n.15 (1st Cir. 2014) (attorney's fees included in amount in controversy where explicitly allowed by statute).

## COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS

38.     Based on the foregoing, this Court has original jurisdiction of this action and removal is proper.  The United States District Court for the District of Massachusetts is the appropriate venue for removal under 28 U.S.C. §1441(a) because it is the federal judicial district encompassing the Superior Court of Massachusetts (Suffolk County), where this suit was originally filed.

39.     A copy of all process, pleadings, and orders received by ExxonMobil is attached as Exhibit 13.  *See* 28 U.S.C. § 1446(a).  Pursuant to Local Rule 81.1(a), ExxonMobil will file within 28 days certified or attested copies of all records, proceedings, and docket entries in the state court action.

40.     Pursuant to 28 U.S.C. § 1446(d), ExxonMobil will promptly file a copy of this Notice of Removal, as well as a Notice of Filing of this Notice of Removal, with the Clerk of the Superior Court of Massachusetts (Suffolk County), and serve a copy of the same on all parties.  A copy of this filing (without exhibits) is attached as Exhibit 14.

41.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.  *See* 28 U.S.C. § 1446(a).  ExxonMobil reserves the right to amend or supplement this Notice of Removal.

ExxonMobil also reserves all defenses and objections available under applicable law, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

WHEREFORE, ExxonMobil respectfully gives notice that this action is hereby removed from the Suffolk County Superior Court, Commonwealth of Massachusetts, to the United States District Court for the District of Massachusetts.

DATE: November 29, 2019

Respectfully submitted,

EXXON MOBIL CORPORATION,

By its attorneys,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON, LLP

Theodore V. Wells, Jr.*
Daniel J. Toal*
1285 Avenue of the Americas
New York, NY  10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

*Pro hac vice forthcoming

PIERCE BAINBRIDGE BECK PRICE &
HECHT LLP

By:  /s/ Thomas C. Frongillo
Thomas C. Frongillo (BBO No. 180690)
Christina N. Lindberg (BBO No. 690443)
tfrongillo@piercebainbridge.com
clindberg@piercebainbridge.com
One Liberty Square, 13th Floor
Boston, MA 02109
Tel: (617) 313-7401

EXXON MOBIL CORPORATION

Patrick J. Conlon*
patrick.j.conlon@exxonmobil.com
22777 Springwoods Village Parkway
Spring, TX 77389
Tel: (832) 624-6336

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the above document was served upon the Attorney General's Office by e-mail and by hand on this 29th day of November 2019.

/s/ Thomas C. Frongillo
Thomas C. Frongillo