UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                       )
COMMONWEALTH OF MASSACHUSETTS,         )
                                       )
                Plaintiff,             )
                                       )        CIVIL ACTION
        v.                             )        NO. 19-12430-WGY
                                       )
EXXON MOBIL CORPORATION,               )
                                       )
                Defendant.             )
                                       )
_____

YOUNG, D.J.                                     May 28, 2020

**MEMORANDUM OF DECISION**

## I.   INTRODUCTION

     The parties offer the Court sharply diverging theories of
this case.  As Exxon Mobil Corporation tells it, Massachusetts
has brought this suit to hold a single oil company liable for
global climate change.  To the Commonwealth, this case is about
seismic corporate fraud perpetrated on millions of consumers and
investors.  Yet as it reaches this Court on a motion to remand,
this case is about the well-pleaded complaint rule -- nothing
more and nothing less.  That rule, in turn, implicates the fault
lines dividing the federal and state judiciaries.

     After oral argument and careful consideration, the Court
remanded the case to state court for want of federal
jurisdiction.  This memorandum fully explicates the Court's

reasoning.  In brief, the Commonwealth's well-pleaded complaint pleads only state law claims, which are not completely preempted by federal law and do not harbor an embedded federal question. Additionally, contrary to the defendant's assertions, the statutory grants of federal jurisdiction for cases involving federal officers or for class actions do not apply here.

### A.   Procedural Background

This case has a complex pre-history dating back to April 19, 2016, when Massachusetts Attorney General Maura Healey ("the Attorney General") issued a Civil Investigative Demand ("CID") to Exxon Mobil Corporation ("ExxonMobil") for potentially defrauding ExxonMobil's consumers and investors, requesting ExxonMobil's internal documents since 1976 relating to carbon dioxide emissions.  See Office of the Attorney General, Civil Investigative Demand No. 2016-EPD-36 (Apr. 19, 2016), https://www.mass.gov/files/documents/2016/10/op/ma-exxon-cid-.pdf.  This investigation was presaged with fanfare by the "AG's United for Clean Power Press Conference" held on March 29, 2016, in which the Attorney General (joined by several counterparts from other states and former Vice President Al Gore) announced a band of twenty attorneys general -- dubbed "the Green 20" -- and noted "the troubling disconnect between what Exxon knew [about climate change] . . . and what the company and industry chose to share with investors and with the American public."  Notice of

Removal ("Notice"), Ex. 2, AGs United for Clean Power Press
Conference 1-2, 12-13, ECF No. 1-2.[1]

Hardly a potted plant, ExxonMobil swiftly countered the CID
with lawsuits in state and federal court.  See In re Civil
Investigative Demand No. 2016-EPD-36, 34 Mass. L. Rptr. 104, No.
SUCV20161888F, 2017 WL 627305, at *1 (Mass. Super. Ct. Jan. 11,
2017) (Brieger, J.), aff'd sub nom. Exxon Mobil Corp. v.
Attorney General, 479 Mass. 312 (2018), cert. denied, 139 S. Ct.
794 (2019); Exxon Mobil Corp. v. Schneiderman, 316 F. Supp. 3d
679, 686 (S.D.N.Y. 2018) ("Running roughshod over the adage that
the best defense is a good offense, [ExxonMobil] has sued the
Attorneys General of Massachusetts and New York . . . each of

---

[1] The Attorney General's focus on ExxonMobil followed a
barrage of investigative exposés alleging that the company knew
for decades of the destructive climate consequences of its
products yet publicly represented otherwise.  Notice, Ex. 13,
Compl. ¶ 3, ECF No. 1-13; see, e.g., Katie Jennings, Dino
Grandoni & Susanne Rust, How Exxon Went from Leader to Skeptic
on Climate Change Research, L.A. Times (Oct. 23, 2015),
https://graphics.latimes.com/exxon-research/ (all internet
sources last accessed May 27, 2020); Sara Jerving, Katie
Jennings, Masako Melissa Hirsch & Susanne Rust, What Exxon Knew
about the Earth's Melting Artic, L.A. Times (Oct. 9, 2015),
https://graphics.latimes.com/exxon-arctic/; Neela Banerjee, Lisa
Song & David Hasemyer, Exxon's Own Research Confirmed Fossil
Fuels' Role in Global Warming Decades Ago, InsideClimate News
(Sept. 16, 2015),
https://insideclimatenews.org/news/15092015/Exxons-own-research-
confirmed-fossil-fuels-role-in-global-warming; Finalist:
InsideClimate News, Pulitzer.org,
https://www.pulitzer.org/finalists/insideclimate-news
(collecting 2015 InsideClimate News series of articles for 2016
Pulitzer Prize Finalist in Public Service).

whom has an open investigation of Exxon."), <u>appeal docketed sub</u>
<u>nom.</u> <u>Exxon Mobil Corp.</u> v. <u>Healey</u>, No. 18-1170 (2d Cir. Apr. 23,
2018); <u>Exxon Mobil Corp.</u> v. <u>Healey</u>, Civ. A. No. 16-CV-469-K
(N.D. Tex. March 29, 2017); <u>Exxon Mobil Corp.</u> v. <u>Healey</u>, 215 F.
Supp. 3d 520 (N.D. Tex. 2016).  When these efforts to quash the
subpoenas failed in New York and Massachusetts,[2] ExxonMobil
fought through a bench trial in New York and won a favorable
decision.  <u>People of New York</u> v. <u>Exxon Mobil Corp.</u>, No.
452044/2018, 2019 WL 6795771 (Sup. Ct. N.Y. Dec. 10, 2019).

In this case, the Attorney General filed her 205-page
complaint in Massachusetts Superior Court on October 24, 2019.
Notice, Ex. 13, Compl., ECF No. 1-13.  ExxonMobil removed the
case to this Court on November 29, 2019, ECF No. 1, and the
Commonwealth filed a motion to remand on December 26, 2019, ECF
No. 13.  The parties briefed this motion.  Mem. L. Comm. Mass.
Supp. Mot. Remand ("Mem. Remand"), ECF No. 14; ExxonMobil's
Opp'n Pl.'s Mot. Remand ("Opp'n"), ECF No. 18; Reply Comm. Mass.
Supp. Mot. Remand ("Reply"), ECF No. 21.  After a hearing on

---

[2] ExxonMobil did, however, successfully induce the attorney
general of the U.S. Virgin Islands to withdraw its subpoena.
<u>See</u> Joint Stipulation Dismissal, <u>Exxon Mobil Corporation</u> v.
<u>Walker</u>, Civ. A. No. 16-CV-00364-K (N.D. Tex. June 29, 2016), ECF
No. 40; Terry Wade, <u>U.S. Virgin Islands to Withdraw Subpoena in</u>
<u>Climate Probe into Exxon</u>, Reuters.com (June 29, 2016 7:55 pm),
https://www.reuters.com/article/us-exxon-mobil-climatechange/u-
s-virgin-islands-to-withdraw-subpoena-in-climate-probe-into-
exxon-idUSKCN0ZF2ZP.

March 17, 2020, conducted telephonically due to the coronavirus pandemic, the Court ALLOWED the motion to remand and the case was remanded to Suffolk County Superior Court.  ECF Nos. 28-29.

### B.   Facts Alleged[3]

Spawned from the marriage of oil leviathans Exxon Corporation ("Exxon") and Mobil Oil Corporation ("Mobil") in 1999, ExxonMobil is "the world's largest publicly traded oil and gas company."  Compl. ¶¶ 1, 47.  It is a New Jersey corporation with its principal place of business in Texas.  Id. ¶ 46.[4]  Id. ¶¶ 52-53.  As an integrated oil and gas company, ExxonMobil "locates, extracts, refines, transports, markets, and sells fossil fuel products."  Id. ¶ 54.  Its business may be divided into three segments: "'upstream' exploration and production operations; 'downstream' refinery and retail operations; and its chemical business, which include[s] the manufacturing and sale of various fossil fuel products that it advertises and sells to Massachusetts consumers."  Id. ¶ 55.  Business has been good.  Recent assessments placed ExxonMobil's market capitalization at

---

[3] The following facts are drawn from the complaint.  See Ortiz-Bonilla v. Federación de Ajedrez de Puerto Rico, Inc., 734 F.3d 28, 34 (1st Cir. 2013) ("The jurisdictional question is determined from what appears on the plaintiff's claim, without reference to any other pleadings.").

[4] Though ExxonMobil is not a Massachusetts citizen, diversity jurisdiction is unavailable because the Commonwealth "is not a 'citizen' for purposes of the diversity jurisdiction." Moor v. Alameda County, 411 U.S. 693, 717 (1973).

$343.43 billion and counted approximately 4.27 billion shares of its common stock issued and outstanding.  Id. ¶ 53.  Selling over 42 billion barrels of petroleum products and taking in more than $5.6 trillion in revenue from 2001-2017, ExxonMobil's sale of petroleum products in those years averaged roughly 8% of the world's daily petroleum consumption.  Id. ¶¶ 58-59.

### 1.   Greenhouse Gases and Climate Change

Production and use of fossil fuels, including ExxonMobil's products, emit greenhouse gases such as carbon dioxide and methane.  Id. ¶ 65.  Between 1988 and 2015, ExxonMobil was the single largest emitter of greenhouse gases of all U.S. companies, when consumer use of the products is factored in, and it was the fifth largest emitter among all non-governmentally owned fossil fuel producers worldwide.  Id. ¶ 67.  According to the Intergovernmental Panel on Climate Change, carbon dioxide emissions from fossil fuels "contributed about seventy-eight percent of the total greenhouse gas emissions increase from 1970 to 2010."  Id. ¶ 202.  Our Earth is plainly getting hotter, and scientists have reached a consensus that this is largely due to rising carbon dioxide concentrations and other greenhouse gas emissions.  Id. ¶¶ 196-199.  This fact threatens our planet and all its people, including those in Massachusetts, with intolerable disaster: "The atmosphere and oceans are warming,

snow and ice cover is shrinking, and sea levels are rising."
Id. ¶ 201.

The Commonwealth alleges that ExxonMobil knew these basic
scientific facts decades ago -- that, in fact, ExxonMobil's
scientists "were among the earliest to understand the risks
posed by increasing greenhouse gas emissions" -- and yet devised
a "systematic effort . . ., reminiscent of the tobacco
industry's long denial campaign about the dangerous effects of
cigarettes, to mislead both investors and consumers in
Massachusetts."  Id. ¶¶ 4-5.  Nearly forty years ago, the
Commonwealth asserts, ExxoMobil already "knew that climate
change presented dramatic risks to human civilization and the
environment as well as a major potential constraint on fossil
fuel use."  Id. ¶ 115.

### 2. ExxonMobil's Campaign of Deception

Despite this knowledge, "[a]n August 1988 Exxon internal
memorandum, captioned 'The Greenhouse Effect,' captures Exxon's
intentional decision to misrepresent both its knowledge of
climate change and the role of Exxon's products in causing
climate change."  Id. ¶ 118.  This memorandum "set forth an
'Exxon Position' in which Exxon would '[e]mphasize the
uncertainty in scientific conclusions regarding the potential
enhanced Greenhouse effect,'" and it "made clear that Exxon 'has
not modified its energy outlook or forecasts to account for

possible changes in fossil fuel demand or utilization due to the
[g]reenhouse effect.'"   Id. ¶ 120 (alterations in original).

In order to advance this position, ExxonMobil and other
fossil-fuel-affiliated corporations and trade groups formed the
"Global Climate Coalition" in 1989, which generally represented
to "investors and consumers of fossil fuels . . . that, contrary
to Exxon's internal knowledge, the role of greenhouse gases in
climate change was not well understood."   Id. ¶¶ 125-126.
Through the Global Climate Coalition, both Exxon and Mobil
pushed a false narrative that climate science was plagued with
doubts.   Id. ¶¶ 127-147.   In 1998, Exxon and other corporations
established the "Global Climate Science Communications Team" in
cahoots with a veteran of Philip Morris' tobacco-misinformation
campaign.   Id. ¶¶ 148-149.   Using a panoply of doubt-sowing
tactics -- including "advertorials" in the New York Times
typically published every Thursday for decades -- this
organization, and ExxonMobil in particular, sought to publicly
shroud the devastating facts that it internally knew.   Id. ¶¶
157-170.   ExxonMobil continued this effort "to downplay and
obscure the risks posed by climate change" through the 2000s and
2010s.   Id. ¶¶ 187-196.

### 3.   ExxonMobil's Misrepresentations to Investors

The Commonwealth alleges that ExxonMobil has deceived its
Massachusetts investors through misrepresentations and

omissions, both general and specific.  In general, "ExxonMobil's
supposed climate risk disclosures together assert that
ExxonMobil has accounted for and is responsibly managing climate
change risks and that, in any event, they pose no meaningful
threat to the Company's business model, its assets, or the value
of its securities."  Id. ¶ 416.  Yet "[t]hese communications are
deceptive because they deny or ignore the numerous systemic
risks that climate change presents to the global economy, the
world's financial markets, the fossil fuel industry, and
ultimately ExxonMobil's own business."  Id. ¶ 417.  Indeed, the
Commonwealth claims that "ExxonMobil's affirmative disclosures,
which incorporate its energy forecasts, not only fail to
disclose these risks; in many cases, the disclosures deceptively
deny and downplay these risks."  Id. ¶ 430.

    More specifically, the Commonwealth alleges that
"ExxonMobil has repeatedly represented to investors . . . that
ExxonMobil used escalating proxy costs" as a way to estimate the
financial dangers of climate change to the corporation, yet
often "ExxonMobil was not actually using proxy costs in this
manner."  Id. ¶¶ 472-473.  Documents disclosed through other
litigation revealed that ExxonMobil was internally using a lower
proxy carbon cost than what it told investors, or that it failed
entirely to use a proxy cost of carbon across many sectors of
its business.  Id. ¶¶ 473-589.  By not internally applying the

proxy cost as it publicly claimed to do, ExxonMobil avoided
"project[ing] billions of dollars of additional climate-related
costs."  Id. ¶ 595.

### 4.   ExxonMobil's Misrepresentations to Consumers

The Commonwealth alleges that "ExxonMobil has misled and
continues to mislead Massachusetts consumers by representing
that their use of ExxonMobil's Synergy™ fuels and 'green' Mobil
1™ motor oil products will reduce greenhouse gas emissions."
Id. ¶ 601.  In marketing these products, "ExxonMobil makes
misleading representations about the products' environmental
benefits and fails to disclose that the development, refining,
and consumer use of ExxonMobil fossil fuel products emit large
volumes of greenhouse gases."  Id.

The Commonwealth also charges ExxonMobil with
"greenwashing," which it defines as "advertising and promotional
materials designed to convey a false impression that a company
is more environmentally responsible than it really is, and so to
induce consumers to purchase its products."  Id. ¶ 603.  In
short, "ExxonMobil promotes its products by falsely depicting
ExxonMobil as a leader in addressing climate change through
technical innovation and various 'sustainability' measures,
without disclosing (i) ExxonMobil's ramp up of fossil fuel
production in the face of a growing climate emergency; (ii) the
minimal investment ExxonMobil is actually making in clean energy

compared to its investment in business-as-usual fossil fuel
production; and (iii) ExxonMobil's efforts to undermine measures
that would improve consumer fuel economy." Id. ¶ 604.  The
consequences of all these lies are dire, Massachusetts asserts,
because "ExxonMobil's deceptive representations and omissions in
its communications with consumers, as with its omissions and
misrepresentations to investors, had the effect of delaying
meaningful action to address climate change." Id. ¶ 767.

### 5.  Causes of Action

The Commonwealth brings four causes of action against
ExxonMobil under the Massachusetts Consumer Protection Act, two
for defrauding investors and two for defrauding consumers:

(1) Count I alleges that ExxonMobil has misrepresented and
failed to disclose material facts regarding systemic climate
change risks to its investors, in violation of Mass. Gen. Laws
ch. 93A, § 4 and 940 C.M.R. §§ 3.16(1)-(2).  Compl. ¶¶ 781-793.

(2) Count II alleges that ExxonMobil has made materially
false and misleading statements to Massachusetts investors
regarding its use of a proxy cost of carbon, in violation of
Mass. Gen. Laws ch. 93A, § 4.  Id. 794-806.

(3) Count III alleges that ExxonMobil has deceived
Massachusetts consumers by misrepresenting the purported
environmental benefit of using its "Synergy™" and "'green' Mobil
1™" products and failing to disclose the risks of climate change

  
caused by its fossil fuel products, in violation of Mass. Gen. Laws ch. 93A, § 2.  Compl. ¶¶ 807-820.

(4) <u>Count IV</u> alleges that ExxonMobil has deceived Massachusetts consumers by promoting a false and misleading "greenwashing" campaign, in violation of Mass. Gen. Laws ch. 93A, § 2.  <u>Id.</u>  ¶¶ 821-830.

The Commonwealth seeks declaratory and injunctive relief, the statutory penalty of $5,000 for each violation of the Massachusetts Consumer Protection Act, and an award of costs and attorneys' fees.  <u>Id.</u> 204-05.

## II. ANALYSIS

ExxonMobil asserts four possible bases for federal jurisdiction in this case: (1) complete preemption; (2) embedded federal question; (3) federal officer removal; and (4) the Class Action Fairness Act.  After first canvassing the legal framework of removal, the well-pleaded complaint rule, and other judicial opinions in similar cases, the Court will analyze these four potential grounds for federal jurisdiction.

### A. Removal Jurisdiction

A defendant may remove a case to federal court when the federal district court would have original jurisdiction, 28 U.S.C. § 1441, such as federal-question jurisdiction, <u>id.</u> § 1331.  "The right of removal is entirely a creature of statute and 'a suit commenced in a state court must remain there until

cause is shown for its transfer under some act of Congress.'"
Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 32 (2002)
(quoting Great Northern Ry. Co. v. Alexander, 246 U.S. 276, 280
(1918)).  Removal statutes generally "are to be strictly
construed."  Id.  "[T]he burden to prove that a federal question
has been pled lies with the party seeking removal," and "any
ambiguity as to the source of law . . . ought to be resolved
against removal."  Rossello-Gonzalez v. Calderon-Serra, 398 F.3d
1, 11 (1st Cir. 2004).  When removal is based on class action or
federal officer involvement, however, no presumption against
removal applies.  See Dart Cherokee Basin Operating Co., LLC v.
Owens, 135 S. Ct. 547, 554 (2014) (no presumption against
removal under the Class Action Fairness Act); Watson v. Philip
Morris Co., 551 U.S. 142, 150 (2007) (federal officer removal
statute must be "liberally construed").

### B.    The Well-Pleaded Complaint Rule

"The presence or absence of federal-question jurisdiction
is governed by the 'well-pleaded complaint rule,' which provides
that federal jurisdiction exists only when a federal question is
presented on the face of the plaintiff's properly pleaded
complaint."  Caterpillar Inc. v. Williams, 482 U.S. 386, 392
(1987).  "The rule makes the plaintiff the master of the claim;
he or she may avoid federal jurisdiction by exclusive reliance
on state law."  Id.  Thus, "a case may not be removed to federal

court on the basis of a federal defense, including the defense

of preemption, even if the defense is anticipated in the

plaintiff's complaint." Id. at 393.  "As a general rule, absent

diversity jurisdiction, a case will not be removable if the

complaint does not affirmatively allege a federal claim."

Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6 (2003).

### C.    The Complete Preemption Exception

The Supreme Court has articulated several exceptions to the

well-pleaded complaint rule.  One such exception occurs "when a

federal statute wholly displaces the state-law cause of action

through complete pre-emption." Id. at 8; López-Muñoz v. Triple-

S Salud, Inc., 754 F.3d 1, 5 (1st Cir. 2014) (describing

"complete preemption," also called "the artful pleading

doctrine," as "a narrow exception to the well-pleaded complaint

rule").  The First Circuit has explained that "[c]omplete

preemption is a short-hand for the doctrine that in certain

matters Congress so strongly intended an exclusive federal cause

of action that what a plaintiff calls a state law claim is to be

recharacterized as a federal claim." Fayard v. Northeast

Vehicle Servs., LLC, 533 F.3d 42, 45 (1st Cir. 2008).  For a

court to so recharacterize -- or "transmogrif[y]," Lawless v.

Steward Health Care Sys., LLC, 894 F.3d 9, 18 (1st Cir. 2018) --

a purported state claim, there must be "exclusive federal

regulation of the subject matter of the asserted state claim

coupled with a federal cause of action for wrongs of the same type." Fayard, 553 F.3d at 46 (citations omitted). "The linchpin of the complete preemption analysis is whether Congress intended that federal law provide the exclusive cause of action for the claims asserted by the plaintiff." López-Muñoz, 754 F.3d at 5.

### D.   The Five District Court Decisions

Five district courts have faced similar motions to remand from governmental plaintiffs suing oil companies on state law grounds related to climate change.  Four of those courts (in four separate circuits) have remanded, including the District Court for the District of Rhode Island, a decision now on appeal before the First Circuit.[5]  The Fourth and Ninth Circuits recently affirmed two such remands, though their analyses were confined to the federal officer removal issue because appellate jurisdiction over the other issues decided by the district courts was foreclosed by precedent.  County of San Mateo v.

---

[5] Rhode Island v. Chevron Corp., 393 F. Supp. 3d 142 (D.R.I. 2019), appeal docketed, No. 19-1818 (1st Cir. Aug. 20, 2019); Board of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc., 405 F. Supp. 3d 947 (D. Colo. 2019), appeal docketed, No. 19-1330 (10th Cir. Sept. 9, 2019); Mayor & City Council of Baltimore v. BP P.L.C., 388 F. Supp. 3d 538 (D. Md. 2019), aff'd, 952 F.3d 452 (4th Cir. 2020), petition for cert. docketed, No. 19-1189 (Mar. 31, 2020); County of San Mateo v. Chevron Corp., 294 F. Supp. 3d 934 (N.D. Cal. 2018), aff'd in part, No. 18-15499, 2020 WL 2703701 (9th Cir. May 26, 2020).

Chevron Corp., Nos. 18-15499, 18-15502, 18-15503, 18-16376, 2020 WL 2703701, at *9 (9th Cir. May 26, 2020); Mayor & City Council of Baltimore v. BP P.L.C., 952 F.3d 452, 456 (4th Cir. 2020).

In contrast, Judge Alsup of the District Court for the Northern District of California denied the motion to remand of Oakland and San Francisco. California v. BP P.L.C., Nos. C 17-06011 WHA, C 17-06012 WHA, 2018 WL 1064293, at *5 (N.D. Cal. Feb. 27, 2018), vacated and remanded sub nom. City of Oakland v. BP PLC, No. 18-16663, 2020 WL 2702680 (9th Cir. May 26, 2020). Judge Alsup reasoned that removal was proper because the cities' "nuisance claims -- which address the national and international geophysical phenomenon of global warming -- are necessarily governed by federal common law." Id. at *2. Though he did not use the term, Judge Alsup's holding is intelligible only as an application of the complete preemption doctrine. See Gil Seinfeld, Climate Change Litigation in the Federal Courts: Jurisdictional Lessons from California v. BP (hereinafter "Jurisdictional Lessons"), 117 Mich. L. Rev. Online 25, 32 (2018) ("Despite Judge Alsup's failure to say so . . . California v. BP is best understood as a complete preemption case.").[6]   Judge Alsup then held that the court could not create

---

[6] In truth, Judge Alsup's confusion is due to the Ninth Circuit precedent he was following, which seems to consider "federal common law" to be a distinct category of removability apart from "complete preemption." See Wayne v. DHL Worldwide

a federal common law remedy in this case due to separation-of-powers concerns and dismissed the claims.  City of Oakland v. BP P.L.C., 325 F. Supp. 3d 1017 (N.D. Cal. 2018), vacated and remanded, No. 18-16663 (9th Cir. May 26, 2020).  One other district court has followed Judge Alsup's logic in holding that New York City's state law claims are preempted by federal common law (which, in turn, is displaced by the Clean Air Act), though that case was filed originally in federal court on diversity jurisdiction and so does not address the well-pleaded complaint rule.  City of New York v. BP P.L.C., 325 F. Supp. 3d 466, 471-76 (S.D.N.Y. 2018), appeal docketed, No. 18-2188 (2d Cir. July 26, 2018).

The courts that disagreed with Judge Alsup's reasoning offered two primary objections.  First, that the federal common law relating to pollution from greenhouse gases has been displaced, see American Elec. Power Co. v. Connecticut ("AEP"), 564 U.S. 410, 424 (2011); Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 854-58 (9th Cir. 2012), and thus the case

---

Express, 294 F.3d 1179, 1183-84 (9th Cir. 2002).  Yet removability on the basis of federal common law, if it exists at all, must rest on the same theory of "complete preemption" articulated by the Supreme Court.  In vacating and remanding Judge Alsup's decision, the Ninth Circuit analyzed the issue under the complete preemption framework but failed to clarify its earlier case law.  See City of Oakland, 2020 WL 2702680, at *6-7.  In any event, the proper inquiry must follow the Supreme Court's "complete preemption" line of cases.

may not be "removed to federal court on the basis of federal common law that no longer exists." County of San Mateo, 294 F. Supp. 3d at 937; Baltimore, 388 F. Supp. 3d at 557 (noting that "any such federal common law claim has been displaced by the Clean Air Act").[7]  Judge Alsup, however, distinguished AEP and Kivalina on the grounds that San Francisco's and Oakland's federal common law claims (1) attacked the production and sale of fossil fuels, not their emissions; and (2) alleged a tort based on global conduct, not simply domestic behavior, as "foreign emissions are out of the EPA and Clean Air Act's reach." California, 2018 WL 1064293, at *4.

Second, that complete preemption must emanate from a congressional directive; judge-made law simply cannot do the

---

[7] A related question is whether Judge Alsup is correct that federal common law may completely preempt state law even where (as he subsequently ruled in this case) a federal common law cause of action never springs into existence due to separation-of-powers constraints.  Indeed, even Judge Alsup acknowledged that this bait-and-switch "may seem peculiar." City of Oakland, 325 F. Supp. 3d at 1028.  On the other hand, the First Circuit has explained that, in complete preemption cases, "the superseding federal scheme may be more limited or different in its scope and still completely preempt," such that the federal cause of action may not provide relief and the state claim "simply disappears." Fayard, 533 F.3d at 46.  Even so, it is far from clear that this reasoning would apply when the federal scheme is not simply "more limited" but has not been created at all.
The parties obliquely debate this issue before this Court. Mem. Remand 17; Opp'n 15-16.  Since other considerations in this case counsel against adopting Judge Alsup's conclusion, however, the Court need not settle this question.

trick.  This is the criticism articulated by Professor Seinfeld, Jurisdictional Lessons 32-38, and echoed by the district courts that have parted ways with Judge Alsup.  See Baltimore, 388 F. Supp. 3d at 556-58; Rhode Island, 393 F. Supp. 3d at 148-49; Boulder County, 405 F. Supp. 3d at 973; County of San Mateo, 294 F. Supp. 3d at 937-38.  On this view, Judge Alsup committed a categorical error in extending the complete preemption doctrine beyond statutory terra firma to ethereal federal common law.

The Ninth Circuit recently vacated and remanded Judge Alsup's ruling.  City of Oakland v. BP P.L.C., No. 18-16663, 2020 WL 2702680 (9th Cir. May 26, 2020).  The panel held that the Clean Water Act does not completely preempt state causes of action.  Id. at *6-7.  Oddly, the Ninth Circuit did not address Judge Alsup's rationale that federal common law, not the Clean Water Act, is the source of complete preemption.  In its silent dismissal of this notion, the Ninth Circuit panel apparently assumed, along with Professor Seinfeld and the other district courts, that complete preemption may flow only from a statute. The panel also rejected an alternative basis for federal jurisdiction not reached by Judge Alsup, namely the embedded federal question doctrine, which will be discussed below.  See id. at *5-6.

**E.    Federal Common Law Does Not Govern These Claims**

ExxonMobil argues that this case is removable because, following Judge Alsup's lead in <u>California</u>, these claims arise under federal common law which completely preempts the state causes of action.  Notice 12-14; Opp'n 14-16.  In resolving the present motion to remand, the Court need not decide the major points of dispute between Judge Alsup and the other courts.[8]

---

[8] In a nutshell, Professor Seinfeld argues that complete preemption is applicable only to statutes, not federal common law.  <u>Jurisdictional Lessons</u> 32-38.  The district courts in <u>Rhode Island</u>, <u>Baltimore</u>, <u>Boulder County</u>, and <u>County of San Mateo</u> have rapidly embraced this theory -- and the Ninth Circuit's opinion in <u>City of Oakland</u>, 2020 WL 2702680, at *6-7, appears to rest on this assumption.  This Court is not persuaded.  The main evidence for Professor Seinfeld's view appears to be that case law generally refers to congressional intent as the touchstone of complete preemption.  <u>See</u> <u>López-Muñoz</u>, 754 F.3d at 5; <u>Rhode Island</u>, 393 F. Supp. 3d at 148-49 (collecting citations).  Yet that language reflects little more than the fact that the cited cases all involved statutory interpretation.  Those opinions were not addressing federal common law at all.

Moreover, two reasons support applying the complete preemption doctrine in federal common law cases.  First, the Supreme Court appears to have done so in at least one scenario.  <u>See</u> <u>Beneficial Nat'l Bank</u>, 539 U.S. at 8 n.4 (acknowledging complete preemption for "possessory land claims under state law brought by Indian tribes because of the uniquely federal 'nature and source of the possessory rights of Indian tribes.'" (quoting <u>Oneida Indian Nation of N.Y.</u> v. <u>County of Oneida</u>, 414 U.S. 661, 667 (1974))); <u>County of Oneida</u> v. <u>Oneida Indian Nation of N.Y.</u>, 470 U.S. 226, 233-36 (1985) (explaining that the tribe's cause of action for possession arose under "federal common law").  Another example may be removal under the federal common law of foreign relations, which some circuits have recognized and analogized to complete preemption.  <u>See</u> <u>Republic of Philippines</u> v. <u>Marcos</u>, 806 F.2d 344, 353-54 (2d Cir. 1986).  <u>But see</u> <u>Patrickson</u> v. <u>Dole Food Co.</u>, 251 F.3d 795, 802 n.5 (9th Cir. 2001) (questioning the Second Circuit's analogy).

Even if Judge Alsup is correct that (1) federal common law may
completely preempt state causes of action and (2) the Clean Air
Act would not displace any federal common law claims here, the
Court would still lack jurisdiction.  That is because the
Commonwealth's claims simply do not implicate federal common law
in the first place.  Accordingly, complete preemption fails
because these claims do not arise under federal common law.

The Supreme Court recently reiterated that federal common
law may exist only when certain "strict conditions" are met,
"one of the most basic" being "that "common lawmaking must be
'necessary to protect uniquely federal interests.'" Rodriguez
v. FDIC, 140 S. Ct. 713, 717 (2020) (quoting Texas Indus., Inc.
v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981) & Banco
Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426 (1964)).  In
other words, federal common law may be created "where there is
an overriding federal interest in the need for a uniform rule of
decision or where the controversy touches basic interests of

---

The second reason to reject Professor Seinfeld's sharp
distinction between statutes and federal common law goes to
first principles.  In our post-Erie world, the "new" federal
common law exists only at the direction of Congress "or where
the basic scheme of the Constitution so demands." AEP, 564 U.S.
at 421.  It is not a creature of judicial inventiveness.  If so,
on what grounds can federal common law be categorically excluded
from the complete preemption doctrine?  Just as a congressional
policy may sometimes require the federal cause of action to be
exclusive and thus completely preempt state law, so too the
"basic scheme of the Constitution" may sometimes require an
exclusively federal cause of action.

federalism." <u>Illinois</u> v. <u>City of Milwaukee</u>, 406 U.S. 91, 105
n.6 (1972).  In particular, the Supreme Court has repeatedly
recognized that "[w]hen we deal with air and water in their
ambient or interstate aspects, there is a federal common law."
<u>AEP</u>, 564 U.S. at 421 (quoting <u>Milwaukee</u>, 406 U.S. at 103).[9]  The
Ninth Circuit has surely overstated matters in saying that
"federal common law includes the general subject of
environmental law," <u>Kivalina</u>, 696 F.3d at 855, but federal
public nuisance law undoubtedly applies to certain serious
environmental injuries.[10]

The allegations in this complaint are far afield of any
"uniquely federal interests."  The complaint, fairly read,
alleges that ExxonMobil hid or obscured the scientific evidence

---

[9] <u>Contra</u> <u>City of Oakland</u>, 2020 WL 2702680, at *5 (overbroad
dictum that "the Supreme Court has not yet determined that there
is a federal common law of public nuisance relating to
interstate pollution").  What the Supreme Court left undecided
is whether private and municipal plaintiffs may bring such a
claim, and whether the "scale and complexity" of global warming
distinguish it "from the more bounded pollution giving rise to
past federal nuisance suits."  <u>AEP</u>, 564 U.S. at 422-23.

[10] The Supreme Court "has not defined the type of harm that
might give rise to a federal public nuisance claim," but it has
suggested that such a claim is appropriate "when 'the health and
comfort of the inhabitants of a State are threatened' to the
point where a sovereign would be tempted to go to war."  Note,
<u>The Sovereign Self-Preservation Doctrine in Environmental Law</u>,
133 Harv. L. Rev. 621, 622-23, 632 (2019) (quoting <u>Missouri</u> v.
<u>Illinois</u>, 180 U.S. 208, 241 (1901)).  Such a definition "would
likely restrict the federal public nuisance claim to
environmental or public health threats, although severe economic
injuries are conceivably included as well."  <u>Id.</u> at 632.

of climate change and thus duped its investors about the long-
term health of its corporation and defrauded consumers of its
fossil fuel products.  The Commonwealth's analogy to the tobacco
industry, e.g., Compl. ¶¶ 116-117; Mem. Remand 13, is apt.  As
part of the tobacco multi-district litigation, Bolivia and
Venezuela sued 18 tobacco companies in state court on common law
claims "that the tobacco industry fraudulently concealed the
dangers of smoking."  In re Tobacco/Governmental Health Care
Costs Litig., 100 F. Supp. 2d 31, 34 (D.D.C. 2000).  The tobacco
companies argued for removal on the grounds that the complaint
implicated the federal common law of foreign relations.  Id. at
35.  Rejecting this argument, the court succinctly explained
that "[t]he question is whether the tobacco industry or the
named defendants engaged in negligence, fraud,
misrepresentation, concealment, or deceit.  That question is not
governed by a federal common law at all, but by state common
law."  Id. at 37.  This analysis holds for the claims against
ExxonMobil.  In short, there is no federal common law here
because "[n]othing about the allegations in these lawsuits
implicates interests that are 'uniquely federal.'"  Id.

     In this respect, this case is distinguishable from
California and City of New York in that both of those cases
involved public nuisance claims with a theory of damages tied to
the impact of climate change.  On those allegations, Judge Alsup

concluded that "a uniform standard of decision is necessary,"

adding:

> If ever a problem cried out for a uniform and
> comprehensive solution, it is the geophysical problem
> described by the complaints, a problem centuries in
> the making (and studying) with causes ranging from
> volcanoes, to wildfires, to deforestation to
> stimulation of other greenhouse gases—and, most
> pertinent here, to the combustion of fossil fuels.
> The range of consequences is likewise universal --
> warmer weather in some places that may benefit
> agriculture but worse weather in others, e.g., worse
> hurricanes, more drought, more crop failures and -- as
> here specifically alleged -- the melting of the ice
> caps, the rising of the oceans, and the inevitable
> flooding of coastal lands.  Taking the complaints at
> face value, the scope of the worldwide predicament
> demands the most comprehensive view available, which
> in our American court system means our federal courts
> and our federal common law.  A patchwork of fifty
> different answers to the same fundamental global issue
> would be unworkable.

California, 2018 WL 1064293, at *3; see also Robert L. Glicksman

& Richard E. Levy, A Collective Action Perspective on Ceiling

Preemption by Federal Environmental Regulation: The Case of

Global Climate Change, 102 Nw. U. L. Rev. 579, 598-600, 606-10

(2008) (evaluating value of uniform environmental regulations).

Without expressing an opinion on Judge Alsup's reasoning,

the Court notes that it does not apply to the Commonwealth's

claims against ExxonMobil since they do not prompt this Court or

any other to provide "answers" to the "fundamental global issue"

of climate change.  Much more modestly, the Commonwealth wants

"to hold ExxonMobil accountable for misleading the state's

investors and consumers." Compl. ¶ 2.  No one doubts that this task falls within the core of a state's responsibility.  See, e.g., Edenfield v. Fane, 507 U.S. 761, 769 (1993) ("[T]here is no question that [a state's] interest in ensuring the accuracy of commercial information in the marketplace is substantial."); Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 607 (1982) ("[A] State has a quasi-sovereign interest in the health and well-being -- both physical and economic -- of its residents in general.").  States routinely enforce consumer protection and securities laws alongside the federal government.[11]  Nor has ExxonMobil provided any reason why protecting Massachusetts consumers and investors from fraud implicates "uniquely federal interests."  It does not.

Accordingly, the Court ruled that the complaint's state law claims are not completely preempted.

**F.   Grable Exception to the Well-Pleaded Complaint Rule**

ExxonMobil invokes another exception to the well-pleaded complaint rule found in Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005).  Grable established that, in a "slim category" of cases, "federal

---

[11] See generally James J. Park, Rules, Principles, and the Competition to Enforce the Securities Laws, 100 Cal. L. Rev. 115 (2012); Jared Elosta, Dynamic Federalism and Consumer Financial Protection: How the Dodd-Frank Act Changes the Preemption Debate, 89 N.C. L. Rev. 1273 (2011).

jurisdiction over a state law claim will lie if a federal issue
is: (1) necessarily raised, (2) actually disputed, (3)
substantial, and (4) capable of resolution in federal court
without disrupting the federal-state balance approved by
Congress." Gunn v. Minton, 568 U.S. 251, 258 (2013). The
Grable inquiry seeks to unearth "an embedded federal question"
in a facially state-law complaint. Rhode Island Fishermen's
All., Inc. v. Rhode Island Dep't of Envtl. Mgmt., 585 F.3d 42,
48 (1st Cir. 2009)

ExxonMobil asserts that two "federal issues" embedded in
the complaint fall within Grable's reach: (1) the complaint
"'touches on foreign relations' and therefore 'must yield to the
National Government's policy,'" Opp'n 7 (quoting American Ins.
Ass'n v. Garamendi, 539 U.S. 396, 413 (2003)); and (2)
adjudication of the complaint "would require a factfinder to
question the careful balance Congress and federal agencies have
struck between greenhouse gas regulation and the nation's energy
needs," id. at 9. Massachusetts responds that "[n]one of those
policies is implicated by and no determination of federal law
need be made in the Commonwealth's action . . . since this case
is about Exxon's marketing and sales misrepresentations about
its products and securities to Massachusetts consumers and
investors." Mem. Remand 12.

The Commonwealth is correct.  The Court need not reach the
question whether ExxonMobil's two asserted "federal issues"
would conjure <u>Grable</u> jurisdiction because those issues are
simply absent in this case.  Contrary to ExxonMobil's caricature
of the complaint, the Commonwealth's allegations do not require
any forays into foreign relations or national energy policy.  It
alleges only corporate fraud.  Whether ExxonMobil was honest or
deceitful in its marketing campaigns and financial disclosures
does not necessarily raise any federal issue whatsoever.  <u>Cf.</u>
<u>Atlantic Richfield Co.</u> v. <u>Christian</u>, 140 S. Ct. 1335, 1350 n.4
(2020).  Every court to consider the question has rejected the
oil-industry defendants' arguments for <u>Grable</u> jurisdiction.  <u>See</u>
<u>City of Oakland</u>, 2020 WL 2702680, at *5-6.  <u>Boulder County</u>, 405
F. Supp. 3d at 965-68; <u>Rhode Island</u>, 393 F. Supp. 3d at 150-51;
<u>Baltimore</u>, 388 F. Supp. 3d at 558-61; <u>County of San Mateo</u>, 294
F. Supp. 3d at 938.[12]  That unanimity is all the more telling

---

[12] Judge Alsup did not reach the <u>Grable</u> question, though he
did partially rely on entanglement with foreign affairs as
requiring that federal law govern rather than state law.
<u>California</u>, 2018 WL 1064293, at *5.  For this same reason, Judge
Alsup subsequently ruled that federal courts cannot make common
law in this area but should leave the matter to the political
branches.  <u>City of Oakland</u>, 325 F. Supp. 3d at 1024-28; <u>see also</u>
<u>City of New York</u>, 325 F. Supp. 3d at 475-76 (same).  ExxonMobil
also cites the United States' <u>amicus</u> brief before the Ninth
Circuit contending that the claims of Oakland and San Francisco
threaten to "undermine the exclusive grants of authority to the
representative branches of the federal government to conduct the
Nation's foreign policy."  Opp'n 8 (quoting Brief of the United
States as Amicus Curiae in Support of Appellees and Affirmance

since those cases involved nuisance claims in which the states and local governments sought damages from oil companies to offset the disastrous effects of climate change.  Such sweeping theories of liability and relief arguably implicate national and international climate policies, yet those courts still deemed Grable inapplicable.  Here, in contrast, Massachusetts relies exclusively on mundane theories of fraud against consumers and investors, without seeking to hold ExxonMobil liable for any actual impacts of global warming.  There is no federal issue embedded in this complaint.

In its opposing memorandum and at oral argument, ExxonMobil leaned heavily on the Fifth Circuit's decision in Board of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., 850 F.3d 714 (5th Cir. 2017).  Opp'n 9-10; Tr. Hr'g 15-16, ECF No. 31.  That decision affirmed Grable jurisdiction over state law claims relating to dredging activities by oil companies when "the scope and limitations of a complex federal regulatory framework [we]re at stake."  Opp'n 9 (quoting Board of Commissioners, 850 F.3d at 725).  Yet the passage of that opinion quoted by ExxonMobil relates to the substantiality prong of the Grable inquiry, not the "necessarily raised" or "actually disputed" prongs.  Indeed, Board of Commissioners is palpably

---

at 16, City of Oakland v. BP, P.L.C., No. 18-16663 (9th Cir. May 17, 2019)).  These arguments do not persuade the Court.

distinguishable because the state law claims at issue were predicated on duties arising from federal statutes, and the "complaint dr[ew] on federal law as the exclusive basis for holding [d]efendants liable for some of their actions."  850 F.3d at 721-22.  Nothing of the kind is presented by the Commonwealth's complaint.

Accordingly, the Court declined to find <u>Grable</u> jurisdiction over the Commonwealth's claims.

### G.    Federal Officer Jurisdiction

ExxonMobil next argues that this case is removable due to the federal officer removal statute, <u>see</u> Opp'n 16-18, which provides that an action may be removed when the suit is against "any officer (or any person acting under that officer) of the United States . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  As the Fourth Circuit recently stated the test in <u>Baltimore</u>: "to remove a case under § 1442(a)(1), a <u>private</u> defendant must show: '(1) that it "act[ed] under" a federal officer, (2) that it has "a colorable federal defense," and (3) that the charged conduct was carried out for [or] in relation to the asserted official authority.'"  952 F.3d at 461-62 (alteration in original) (quoting <u>Sawyer</u> v. <u>Foster Wheeler LLC</u>, 860 F.3d 249, 254 (4th Cir. 2017)).

ExxonMobil argues that it was "acting under" federal officers because it "has explored for, developed, and produced

oil and gas on federal lands pursuant to leases issued by the federal government," and those "federal leases contain many provisions that demonstrate ExxonMobil acted at the direction of a federal officer."  Notice 14-15.  ExxonMobil also asserts various colorable federal defenses, such as preemption, the foreign affairs doctrine, and violations of the Commerce Clause, Due Process Clause, and First Amendment.  Id. at 16.

The Commonwealth offers no argument that ExxonMobil was not "acting under" federal officials in its drilling and oil production activities.  But see Baltimore, 952 F.3d at 463-66 (holding that oil companies were not "acting under" federal officials, within the meaning of § 1442(a)(1), in developing oil and gas pursuant to federal leases); County of San Mateo, 2020 WL 2703701, at *8-9 (same); Boulder County, 405 F. Supp. 3d at 976 (same, with specific reference to ExxonMobil).  Nor does it argue that ExxonMobil's purported federal defenses are not "colorable."  Instead, the Commonwealth focuses its firepower on the "relating to" element, § 1442(a)(1), arguing that "there is simply no nexus, causal or otherwise, between the Commonwealth's causes of action and any Exxon conduct purportedly taken at the direction of federal officials."  Mem. Remand 18-19.

This is the nub of the dispute.  ExxonMobil seizes on a few lines here and there in the complaint to construe it as alleging that "ExxonMobil's federally-directed actions 'are a major cause

of global climate change' and will have 'serious, life-threatening, and costly impacts on the people of the Commonwealth.'"  Opp'n 18 (quoting Compl. ¶¶ 54-69, 222-252). Taking these and other lines out of context, ExxonMobil argues that this "suit is thus ultimately directed at stopping or reducing the actions federal leases obliged ExxonMobil to pursue, namely the production and sale of fossil fuels." Id. at 17; id. (quoting Compl. ¶¶ 601-602, 645) ("Plaintiff alleges that . . . ExxonMobil's fossil fuel products . . . could never be considered 'safe and environmentally beneficial' because 'the development, production, refining, and consumer use of ExxonMobil fossil fuel products' increase 'greenhouse gas emissions.'").  Massachusetts insists that this reading of the complaint is a "sleight-of-hand," as "[t]he Complaint has nothing to do with efforts to stop or reduce Exxon's production or sale of its fossil fuel products" but, in truth, is only "a state action aimed at protecting consumers and investors from Exxon's deceptive representations in the marketplace."  Mem. Remand 17-18.

    Massachusetts is correct about the fairest reading of the complaint, though it erroneously describes the legal standard for federal officer removal.  The Commonwealth mistakenly quotes Watson v. Philip Morris Cos. for the proposition that federal officer removal is permissible only if "the 'act[s]' that are

the subject of the petitioner's complaint" were carried out

under the direction of federal officers.  Mem. Remand 18

(alteration and emphasis in original) (quoting 551 U.S. 142, 150

(2007)).  Yet Watson predates the Removal Clarification Act of

2011, Pub. L. No. 112-51, 125 Stat. 545, of which section

(b)(1)(A) amended the federal officer removal statute to add the

words "or relating to" before "any act under color of such

office."  28 U.S.C. § 1442(a)(1).  This amendment was, plainly

enough, "intended to broaden the universe of acts that enable

Federal officers to remove to Federal court."  H.R. Rep. No.

112-17, pt. 1, at 6 (2011).  "By the Removal Clarification Act,

Congress broadened federal officer removal to actions, not just

causally connected, but alternatively connected or associated,

with acts under color of federal office."  Latiolais v.

Huntington Ingalls, Inc., 951 F.3d 286, 292 (5th Cir. 2020) (en

banc) (emphases in original).[13]

Nonetheless, even under this more expansive standard,

ExxonMobil's marketing and sale tactics were not plausibly

"relat[ed] to" the drilling and production activities supposedly

_____

[13] The Rhode Island Court also relied upon the lack of a
"causal connection" between the oil companies' marketing
practices and the conduct governed by the federal leases in
rejecting federal officer removal jurisdiction, uncritically
citing pre-2011 case law.  393 F. Supp. 3d at 152 (citing Mesa
v. California, 489 U.S. 121, 131-32 (1989)).  For the reasons
explained below, however, a properly up-to-date analysis reaches
the same result.

done under the direction of the federal government.  ExxonMobil
seeks to bridge this gap by overreading the complaint, arguing
that the "ultimate[]" goal of the complaint is "stopping or
reducing the actions federal leases obliged ExxonMobil to
pursue, namely the production and sale of fossil fuels" -- and
that these activities are "at the heart" of the complaint.
Opp'n 16-17.  A fair reading of the complaint tells a far
different story.

The Fourth Circuit recently rejected a similar attempt by
oil-industry defendants to establish removal on this basis:

> When read as a whole, the Complaint clearly seeks to
> challenge the promotion and sale of fossil fuel
> products without warning and abetted by a
> sophisticated disinformation campaign.  Of course,
> there are many references to fossil fuel production in
> the Complaint, which spans 132 pages.  But, by and
> large, these references . . . [are] not the source of
> tort liability.  Put differently, Baltimore does not
> merely allege that Defendants contributed to climate
> change and its attendant harms by producing and
> selling fossil fuel products; it is the concealment
> and misrepresentation of the products' known dangers -
> - and simultaneous promotion of their unrestrained use
> -- that allegedly drove consumption, and thus
> greenhouse gas pollution, and thus climate change.

Baltimore, 952 F.3d at 467; see also Boulder County, 405 F.
Supp. 3d at 977.

In Baltimore, the actual production of fossil fuels was far
more related to the complaint than it is here, because Baltimore
sought damages for climate-related injuries while Massachusetts
seeks only fines for the alleged deceptions.  Even so, the

Fourth Circuit found it easy to separate the properly pled misrepresentation allegations from the surrounding context of fossil fuel production, holding that the alleged "disinformation campaign" was the core of the complaint and was unrelated to any action under federal officials.  860 F.3d at 467.  This Court similarly construed the Commonwealth's complaint and therefore rebuffed ExxonMobil's effort to remove the case on the grounds of the federal officer removal statute.

### H.   Class Action Jurisdiction

ExxonMobil's final argument is that the case is removable under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the complaint brought by the Attorney General is essentially a class action in disguise.  Notice 16-17; Opp'n 18-20.  A "class action" filed in state court is removable, 28 U.S.C. § 1453(b), provided there is minimal diversity and the aggregate amount in controversy exceeds $5,000,000.  Mississippi ex rel. Hood v. AU Optronics Corp., 134 S. Ct. 736, 740 (2014).  The statute defines the term "class action" to mean "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B).

The present complaint was not filed under Rule 23, of course, but ExxonMobil contends that Mass. Gen. Laws ch. 93A, §

4, which authorizes the Attorney General to bring these claims "in the public interest," amounts to a "similar State statute" and therefore establishes federal jurisdiction.  Opp'n 18-20. Massachusetts retorts that its complaint "plainly falls within the category of parens patriae actions," which are not similar to a class action under Rule 23 because "a Chapter 93A claim requires none of the elements of a state or federal Rule 23 'class action' -- numerosity, typicality, commonality, or notice to all members of a class."  Mem. Remand 20.[14]

The Commonwealth has the better of this argument. Admittedly, the statutory definition of "class action" is perplexing.  For one thing, it states that "the term 'class

_____

[14] Massachusetts could have argued (but did not) that even if the complaint is a "class action" within the meaning of CAFA there is not even minimal diversity because the Commonwealth is not a "citizen" for purposes of diversity jurisdiction, Moor v. Alameda County, 411 U.S. 693, 717 (1973), and the Commonwealth is "the real party in interest" rather than the purported class members.  See AU Optronics Corp. v. South Carolina, 699 F.3d 385, 394 (4th Cir. 2012); Illinois v. AU Optronics Corp., 794 F. Supp. 2d 845, 856 (D. Ill. 2011).  This argument is not unique to CAFA, and its corollary could have been raised by ExxonMobil on the basis of the general diversity statute; that is, that the individual consumers and investors are the real parties in interest (with Massachusetts being only a nominal party) and therefore there is complete diversity.  See In re Standard & Poor's Rating Agency Litig., 23 F. Supp. 3d 378, 401-07 (S.D.N.Y. 2014).  Since neither Massachusetts nor ExxonMobil raises these arguments based on divining the "real party in interest," the Court need not address them.  But see West Virginia ex rel. McGraw v. CVS Pharmacy, Inc., 646 F.3d 169, 180 (4th Cir. 2011) (Gilman, J., dissenting) (collapsing the "similarity" inquiry into the "real party in interest" inquiry).

action' means any civil action filed . . . as a class action,"
28 U.S.C. § 1332(d)(1)(B), which is hopelessly "circular." <u>West
Virginia ex rel. McGraw</u> v. <u>CVS Pharmacy, Inc.</u>, 646 F.3d 169, 179
(4th Cir. 2011) (Gilman, J., dissenting).  For another, the
statute does not disclose the criteria for evaluating when a
state statute is "similar" to Rule 23.  <u>Id.</u>  In making sense of
the statute, the Fourth Circuit reasoned that "Congress
undoubtedly intended to define 'class action' in terms of its
similarity and close resemblance to Rule 23."  <u>Id.</u> at 174
(majority opinion).  Somewhat differently, the Second Circuit
explained that there are two separate elements, such that a
state-law based CAFA class action "must be filed under a statute
or rule that is <u>both</u> similar to Rule 23 <u>and</u> authorizes the
action to proceed 'as a class action.'"  <u>Purdue Pharma L.P.</u> v.
<u>Kentucky</u>, 704 F.3d 208, 214 (2d Cir. 2013) (emphases supplied).
However the sentence is parsed, courts have converged upon a
test of similarity that looks to "the familiar hallmarks of Rule
23 class actions; namely, adequacy of representation,
numerosity, commonality, typicality, [and] the requirement of
class certification."  <u>Id.</u>[15]  A "similar" state statute or rule

---

[15] The Second Circuit considers the certification
requirement itself as a relevant factor in determining
similarity, <u>id.</u> at 216 n.6, whereas the Fourth Circuit refers
only to "the four criteria stated in Rule 23(a)," <u>CVS</u>, 646 F.3d
at 175.  <u>Cf.</u> <u>West</u> <u>Virginia ex rel. McGraw</u> v. <u>Comcast Corp.</u>, 705
F. Supp. 2d 441, 453 (E.D. Pa. 2010) (identifying the "three

need not contain all of the other conditions and administrative
aspects of Rule 23, but it must "at a minimum, provide a
procedure by which a member of a class whose claim is typical of
all members of the class can bring an action not only on his own
behalf but also on behalf of all others in the class."  Id. at
217 (alterations deleted) (quoting CVS, 646 F.3d at 175).

On this basis, the Second, Fourth, Fifth, Seventh, and
Ninth Circuits have held that CAFA generally does not confer
federal jurisdiction over state parens patriae actions.  Id.;
CVS, 646 F.3d at 175-77 (holding that state attorney general's
consumer protection claim was not removable under CAFA);
Mississippi ex rel. Hood v. AU Optronics Corp., 701 F.3d 796,
798-99 (5th Cir. 2012), rev'd on other grounds, 134 S. Ct. 736,
739 (2014); LG Display Co. v. Madigan, 665 F.3d 768, 774 (7th
Cir. 2011); Washington v. Chimei Innolux Corp., 659 F.3d 842,
848-49 (9th Cir. 2011).  Though the First Circuit has not
addressed the issue, it denied review when a district court in
this circuit followed the consensus.  New Hampshire v. Purdue
Pharma, No. 17-cv-427-PB, 2018 WL 333824, at *2-3 (D.N.H. Jan.
9, 2018) (holding that a New Hampshire's suit alleging fraud by
an opioid medication company is a "straightforward parens

---

baseline requirements" for protecting the interests of unnamed
plaintiffs in class actions as "1) notice, 2) an opt-out
opportunity, and 3) adequate representation").

patriae action that bears no resemblance to a Rule 23 class

action"), <u>review denied</u>, No. 17-8041 (1st Cir. Jan. 31, 2018).[16]

Here, the authorizing statute for the Attorney General's

claims, Mass. Gen. Laws ch. 93A, § 4, contains no procedural

requirements akin to those of Rule 23, such as adequacy,

typicality, numerosity, commonality, or certification.  It is

not "similar" to Rule 23 within the meaning of CAFA, as the

consensus of judicial authority construes that statute.

ExxonMobil argues that those cases are either wrongly

decided or distinguishable.  It notes that the Massachusetts

Appeals Court has stated that "[a]n action brought by the

Attorney General under G.L. c. 93A, § 4, is comparable to a

class action."  <u>Commonwealth</u> v. <u>Chatham Development Co., Inc.</u>,

49 Mass. App. Ct. 525, 528 (2000).  ExxonMobil further quotes

the Supreme Judicial Court's holding that an Attorney General's

action under section 4 of chapter 93A may obtain relief for

unnamed similarly situated individuals because "[t]he very

purpose of the Attorney General's involvement is to provide an

efficient, inexpensive, prompt and broad solution to the alleged

wrong," and there is "no logical reason" to distinguish the

---

[16] The class action question did not come up in <u>Rhode Island</u> v. <u>Chevron Corp.</u>, so the First Circuit will have no occasion to address the issue when it considers that case on appeal.  Nor was class action removal raised in <u>County of San Mateo</u>, <u>Boulder County</u>, or <u>Baltimore</u>.

Attorney General's action from "a class action" in this respect. Commonwealth v. DeCotis, 366 Mass. 234, 245-46 (1974).

Yet the fact that Massachusetts courts recognize chapter 93A, section 4 claims as in some ways analogous to class actions does not bring such claims within CAFA's federal jurisdiction unless the state statute contains procedures "similar" to those under Rule 23.  Indeed, one court rejected class action removal for a consumer protection claim brought by the state's attorney general even though the authorizing statute expressly called the attorney general's suit "a class action."  Nessel ex rel. Michigan v. Amerigas Partners, L.P., 421 F. Supp. 3d 507, 513 (E.D. Mich. 2019); see also National Consumers League v. Flowers Bakeries, LLC., 36 F. Supp. 3d 26, 35-36 (D.D.C. 2014) (holding that private attorney general action, even when brought under statute that authorizes claim "on behalf of the interests of . . . a class of consumers," is not "similar" to Rule 23 because there are no requirements of adequacy, numerosity, commonality, and typicality).

In addition to the absence of typical class-action procedures, chapter 93A, section 4 differs from class actions with respect to the available remedies.  Although the statute does authorize damages paid to individuals who suffered loss, it also authorizes injunctive relief and "a civil penalty" payable to the Commonwealth -- which is the relief Massachusetts seeks

here.  Compl. 205.  This underscores that the Commonwealth acts
here not as a representative of a class of injured citizens but
in its own right as a sovereign.  Cf. Baumann v. Chase Inv.
Servs. Corp., 747 F.3d 1117, 1123 (9th Cir. 2014) (holding that
state statute authorizing class actions with civil penalties
payable to both state and the class was not similar to Rule 23
for purposes of CAFA); Kokesh v. SEC, 137 S. Ct. 1635, 1643
(2017) (holding that SEC's remedy of disgorgement is a "penalty"
because violation was "committed against the United States
rather than an aggrieved individual -- this is why, for example,
a securities-enforcement action may proceed even if victims do
not support or are not parties to the prosecution").[17]

ExxonMobil further argues that CAFA's purpose and
legislative history indicate that federal jurisdiction is
appropriate here.  Opp'n 20 (CAFA is to be "interpreted
liberally" such that "lawsuits that resemble a purported class
action should be considered class actions." (quoting S. Rep. No.

---

[17] ExxonMobil argues that the Commonwealth's securities
claims here are "brought only on behalf of a discrete,
identifiable group of private individuals and institutions,
i.e., Massachusetts investors in ExxonMobil securities."  Opp'n
19 n.23.  CAFA refers to the nature of the statute in general,
though, and not to the circumstances of a particular action, so
it is doubtful that the facts of the complaint at hand could
bear upon whether the state statute is "similar" to Rule 23.
Even were that so, it is clear enough that here the Attorney
General's action under chapter 93A, section 4 is a sovereign act
and not straightforwardly on behalf of the investors.

109-14, at 35 (2005), reprinted in 2005 U.S.C.C.A.N. 3, 34)).

Whatever the quoted portion of the Senate Report means, its

authority is dubious.  See College of Dental Surgeons v.

Connecticut Gen. Life Ins. Co., 585 F.3d 33, 38 n.2 (1st Cir.

2009) (explaining that this Senate Report was not issued until

ten days after enactment, so its "value as a means of discerning

congressional intent is clouded").  Nor does this Court read

much into the fact that Congress rejected an amendment to CAFA

that would have exempted suits by state attorneys general.  See

CVS, 646 F.3d at 177 ("This legislative history is hardly

probable."); cf. Central Bank, N.A. v. First Interstate Bank,

N.A., 511 U.S. 164, 187 (1994) ("Congressional inaction lacks

persuasive significance because several equally tenable

inferences may be drawn from such inaction, including the

inference that the existing legislation already incorporated the

offered change." (quoting United States v. Wise, 370 U.S. 405,

411 (1962))).

Finally, nothing much is gained by ExxonMobil's citation of

"CAFA's primary objective" as "ensuring 'Federal court

consideration of interstate cases of national importance.'"

Standard Fire Ins. Co. v. Knowles, 568 U. S. 588, 595 (2013)

(quoting CAFA § 2(b)(2), 119 Stat. 5).  This is not an

interstate case except in the trivial sense in which all

diversity cases are interstate; nor is it of special national

importance.  On the contrary, since "[t]he [Massachusetts] Attorney General initially filed this action in a [Massachusetts] state court to enforce, on behalf of [Massachusetts] and its citizens, state consumer protection laws applicable only in [Massachusetts]," recognizing federal jurisdiction would "risk trampling on the sovereign dignity of the [Commonwealth] and inappropriately transforming what is essentially a [Massachusetts] matter into a federal case."  CVS, 646 F.3d at 178.

Accordingly, the Court followed the unmistakable judicial consensus and ruled that the Commonwealth's action is not a "class action" under CAFA.

## III. CONCLUSION

The well-pleaded complaint rule governs this case and deprives this Court of jurisdiction over the Commonwealth's thoroughly state law claims.  In the absence of any applicable statutory or doctrinal exception to this rule, the Court ALLOWED the motion to remand the case back to state court.

In disclaiming federal jurisdiction over this case, the Court does not quarrel with Judge Alsup's sensible and eloquent plea that "[i]f ever a problem cried out for a uniform and comprehensive solution, it is the geophysical problem" of climate change.  California, 2018 WL 1064293, at *3.  Rather, the Court concludes that the "problem" at issue in this

complaint is not geophysical but economic -- namely, has

ExxonMobil been sufficiently candid with its investors and

customers in Massachusetts about the simmering calamity of

global warming?  That question is properly for the courts of the

Commonwealth to decide.


**SO ORDERED.**


/s/ William G. Young_____
WILLIAM G. YOUNG
DISTRICT JUDGE